# EXHIBIT 1

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
~~BUSINESS LITIGATION SESSION~~
DOCKET NO. 1884cv03686

)
JONATHAN MULLANE,                    )
                                     )
        *Plaintiff,*                 )
v.                                   )
                                     )
FEDERICO A. MORENO and               )
BREAKING MEDIA, INC.,                )
                                     )
        *Defendants.*                )
_____)

## **VERIFIED COMPLAINT AND DEMAND FOR TRIAL BY JURY**

COMES NOW Plaintiff Jonathan Mullane (hereinafter, "Plaintiff" or "Mullane"), and brings this action for declaratory and equitable relief, together with monetary damages, against Defendants Federico A. Moreno (hereinafter, "Defendant Moreno" or "Judge Moreno") and Breaking Media, Inc. (hereinafter, "Defendant Breaking Media" or "Breaking Media").

The instant action before this Honorable Court pertains to the unlawful *ultra vires* interference of Defendant Moreno in connection with two (2) separate Massachusetts contracts:

(i) an employment agreement between Plaintiff and the United States Attorney's Office (hereinafter, "USAO"); and

(ii) a separate employment agreement between Plaintiff and the United States Securities and Exchange Commission (hereinafter, "SEC").

As further explained herein, Defendant Breaking Media intentionally published and republished certain factually false and defamatory allegations of criminal conduct, including, *inter alia*, defamatory representations made by Defendant Moreno. Defendant Breaking Media further made other factually false representations regarding Plaintiff, many of which were even contradicted by the public record. As a direct and foreseeable result of the wrongful acts and omissions of

Defendants herein, the defamatory representations were thereupon republished within this Commonwealth, thereby causing Plaintiff further irreparable harm.

In support hereof, Plaintiff states and avers as follows:

## PARTIES

1. Plaintiff Jonathan Mullane is a natural person and citizen of the Commonwealth of Massachusetts, and resides in Somerville, Middlesex County, Massachusetts.

2. Defendant Federico A. Moreno is a natural person and citizen of the State of Florida.

3. Defendant Breaking Media, Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business at 611 Broadway, Suite 907D, New York City, NY 10012.

## JURISDICTION AND VENUE

4. This Court has original subject matter jurisdiction pursuant to Mass. Gen. Laws ch. 212 § 3.

5. This Court has *in personam* jurisdiction pursuant to Mass. Gen. Laws ch. 223A § 3, and because the exercise of jurisdiction by this Court comports with constitutional due process. The subject Massachusetts contracts were entered into by Plaintiff, a citizen of Massachusetts, while physically present in the Commonwealth. *Inter alia*, the unlawful acts and omissions of Defendants foreseeably caused the republication of the defamatory representations within the Commonwealth. See, e.g., Murphy v. Bos. Herald, Inc., 449 Mass. 42, 65 (2007).

6. The Business Litigation Session is proper pursuant to Superior Court Administrative Directive 17-1, as the causes of action herein involve employment agreements and violations involving business relationships.

2

## MATERIAL FACTS

7.   In or around July 2018, while present in Massachusetts, Plaintiff entered into a contractual employment agreement with the USAO. To wit, the USAO solicited certain services by Plaintiff, whereby Plaintiff agreed to work as a law clerk intern in the Miami, Florida office of the USAO.

8.   In or around December 2018, while present in Massachusetts, Plaintiff entered into a second, and entirely separate, contractual employment agreement with the SEC. Specifically, the SEC solicited certain services by Plaintiff, whereby Plaintiff agreed to work as a law clerk intern in the Miami, Florida office of the SEC.

9.   In or around April 2018, Defendant Moreno, a judge in the employ of the United States District Court for the Southern District of Florida, acted *ultra vires*, outside the scope of his professional authority, and beyond the purview of his judicial duties by willfully and knowingly interfering with Plaintiff's employment agreements with the USAO and SEC.

10.  At the time in question, Plaintiff was an employee of the USAO.

11.  Defendant Moreno, who was not Plaintiff's employer, informed Plaintiff in April 2018 of Defendant Moreno's intention to directly interfere with the employment practices of the executive branch of the federal government, to wit, the United States Department of Justice and USAO, and informed Plaintiff of his intention to directly cause the USAO to unlawfully sever its employment agreement with Plaintiff.

12.  Acting *ultra vires,* Defendant Moreno unlawfully abused his authority and privileges as a federal judge in order to willfully and knowingly interfere with the Massachusetts contracts and the employment practices of the executive branch of the United States government.

13.  Defendant Moreno enjoyed a personal relationship with acting U.S. Attorney Benjamin G. Greenberg (hereinafter, "Attorney Greenberg").

14.  During a personal telephone call with Attorney Greenberg in or around April 2018, Defendant Moreno knowingly interfered with the aforesaid USAO employment contract by maliciously and falsely accusing Plaintiff of criminal conduct.

15. Defendant Moreno knew, or was reckless in not knowing, that the aforesaid allegations made by him against Plaintiff were factually false.

16. By accusing Plaintiff of criminal conduct, Defendant Moreno willfully and knowingly caused the USAO to sever its employment agreement with Plaintiff.

17. Defendant Moreno acted with "actual malice" and spite in his interference with the Massachusetts contracts, and unquestionably intended to cause Plaintiff harm.

18. Indeed, Defendant Moreno was fully cognizant of the fact that, as an Article III judge limited in his authority under the separation of powers doctrine, *inter alia*, Defendant Moreno was not authorized to compel and order the USAO—an agency which is part of the executive branch, as opposed to the judiciary—to terminate its contractual relationship with Plaintiff.

19. Unfortunately for Plaintiff, Defendant Moreno's efforts were successful. As a direct result of Defendant Moreno's intentional interference with the aforesaid Massachusetts contractual agreement, the USAO thereupon breached the said agreement with Plaintiff. Plaintiff was subsequently terminated from his employment at the USAO.

20. By interfering with the aforesaid employment contract, Defendant Moreno acted with an improper motive and intended to directly harm Plaintiff.

21. Defendant Moreno knew, or was willful in not knowing, that his false representations to Attorney Greenberg and the USAO were not privileged.

22. Defendant Moreno knew, or was willful in not knowing, that the aforesaid allegation of criminal conduct would also harm Plaintiff's employment at the SEC.

23. Defendant Moreno harbored significant animosity and ill will toward Plaintiff, as proven by the April 2018 hearing transcript. [**EXHIBIT A**].

24. During the subject April 2018 personal telephone call with Attorney Greenberg, Defendant Moreno engaged in wrongful means by intentionally or recklessly defaming and slandering Plaintiff.

25. More specifically, Defendant Moreno improperly stated as **irrefutable fact** that Plaintiff had engaged in criminal conduct.

4

26.   Indeed, at no time relevant hereto has Defendant Moreno retracted the false
      representations made regarding Plaintiff—notwithstanding the fact that no criminal
      charges have ever been filed against Plaintiff.

27.   Indeed, Defendant Moreno's accusations against Plaintiff during the personal April 2018
      telephone call were so farfetched, illogical, and unsupported by the facts that not once has
      Plaintiff even been questioned by the USAO, the Federal Bureau of Investigation ("FBI"),
      or by any other law enforcement agency in connection therewith.

28.   During the subject April 2018 telephone call, Defendant Moreno knowingly slandered
      Plaintiff by erroneously and maliciously stating to Attorney Greenberg that Plaintiff had
      violated 18 U.S.C. § 912, a criminal offense punishable by three (3) years in federal prison.

29.   *Inter alia*, Defendant Moreno bizarrely claimed that Plaintiff unlawfully "pretended" to
      have been sent on behalf of the United States government to "deceptively" obtain copies
      of the record from Defendant Moreno's clerk in Plaintiff's personal **$1,600** credit card
      dispute.

30.   Indeed, as this Honorable Court is aware, one need not be a federal employee in order to
      obtain mere photocopies of a public, unsealed civil credit card dispute.

31.   *Arguendo*, while Defendant Moreno may have been authorized to ask the USAO, in "good
      faith," to conduct a criminal investigation of any suspected criminal conduct, as may be
      permitted within the purview of his official duties, here, Defendant Moreno unlawfully
      acted *ultra vires* through personal communications by alleging criminal conduct by Plaintiff
      as an irrefutable "fact" to Attorney Greenberg, Plaintiff's employer.

32.   At all times relevant hereto, Defendant Moreno was fully aware that Plaintiff was in the
      employ of Attorney Greenberg and the USAO.

33.   Defendant Moreno knew, or was willful in not knowing, that Plaintiff was presumed
      innocent of *all* criminal charges as a matter of law.

34.   In point of fact, even to this day, Plaintiff has never been charged with violating 18 U.S.C.
      § 912—or any other crime—by the USAO or any other law enforcement agency in
      connection herewith.

5

35.   Defendant Moreno's accusations against Plaintiff were stated as unquestionable, irrefutable "facts"—when in reality, Plaintiff was entitled to a presumption of innocence under the Due Process clause of the United States Constitution, *inter alia*.

36.   Accordingly, the *ultra vires* means by which Defendant Moreno interfered with the subject contracts during a personal telephone call were unlawful, as they entailed slander *per se* and an unfair denial of Plaintiff's constitutional right to a presumption of innocence.

37.   Defendant Moreno improperly "called in a favor" with Attorney Greenberg during the aforesaid personal telephone call in order to interfere with the subject Massachusetts contracts. Indeed, the U.S. District Court for the Southern District of Florida, of which Defendant Moreno was formerly the chief judge, had appointed Attorney Greenberg to his position as acting U.S. Attorney.

38.   Defendant Moreno's actions were discriminatory, as they sought to prevent Plaintiff from exercising his right to petition the judiciary for redress, as guaranteed under the First Amendment of the United States Constitution.

39.   Instead of questioning Plaintiff in chambers, Defendant Moreno ordered Plaintiff to appear in his courtroom for a "miscellaneous hearing"—without having legal counsel present—on or about April 10, 2018.

40.   As further proof of Defendant Moreno's ill will and intent to cause Plaintiff harm, during the aforesaid hearing, Defendant Moreno abused his power and authority as a federal judge in order to reiterate in open court all of the defamatory representations he had previously made regarding Plaintiff during his personal telephone call with Attorney Greenberg.

41.   As further proof of Defendant Moreno's ill will and intent to cause Plaintiff harm, Defendant Moreno *himself* called Plaintiff on his personal mobile phone on or about April 9, 2018. In his recorded voice message, Defendant Moreno—fully apprised of the fact that Plaintiff was unrepresented by legal counsel—unethically engaged in deception by instructing Plaintiff to appear in his courtroom the following morning.

42.   Acting *ultra vires,* Defendant Moreno falsely and deceptively informed Plaintiff that the scheduled hearing pertained to the civil $1,600 credit card dispute.

43.   Defendant Moreno had actual knowledge of the fact that, in reality, the scheduled hearing pertained to a criminal matter.

6

44. Defendant Moreno knew, or was willful in not knowing, that Plaintiff should have been informed of:

   (i)    the criminal nature of the hearing; and

   (ii)   Plaintiff's constitutional right to have legal counsel present.

45. Defendant Moreno knew, or was willful in not knowing, that any accusations against Plaintiff made in open court would be transcribed by the court reporter and would become publicly available.

46. Defendant Moreno—a leading candidate for the United States Supreme Court at the time in question—knew, or was reckless in not knowing, of the High Court's well-known holding in Miranda v. Arizona, 384 U.S. 436 (1966) pertaining to such criminal interrogations wherein persons such as Plaintiff are not "free to leave" and are deprived of their "freedom of action."

47. The Miranda Court held, in pertinent part:

   "The U.S. Const. amend. V privilege against self-incrimination is available **outside of criminal court proceedings** and serves to protect persons in **all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves.** Without proper safeguards, the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. **In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.**"
   (Emphasis supplied) at 467.

48. Defendant Moreno intentionally or recklessly disregarded Plaintiff's constitutional rights, in violation of the Court's holding in Miranda, *supra*.

49. Plaintiff was not free to leave during the subject April 10, 2018 hearing.

50. At no time relevant hereto did Defendant Moreno inform Plaintiff of his rights under Miranda; this includes, without limitation, Plaintiff's right to be represented by an attorney.

7

51.   Defendant Moreno's manifest disregard for Plaintiff's rights under <u>Miranda</u> further proves Defendant Moreno's ill-will and actual malice vis-à-vis Plaintiff.

52.   Defendant Moreno's representations—both before and during the subject April 10, 2018 hearing—are not protected by "absolute immunity" because they did not pertain to the <u>civil</u> $1,600 credit card dispute.

53.   Subsequent to the foregoing events, on or about April 30, 2018, through its online publication "Above the Law," Defendant Breaking Media published an article entitled as follows:

### "JUDGE DETONATES PRO SE LAW STUDENT SO HARD I NOW MUST DEFEND A DUMB KID"

54.   *Inter alia,* the aforesaid article discussed Judge Moreno's accusations against Plaintiff. **[EXHIBIT B]**.

55.   The April 30 article regarding Plaintiff, a "private person," was in no way a matter of "public concern."

56.   *Arguendo,* while Defendant Moreno's behavior may have been a matter of "public concern" given that, at the time in question, Defendant Moreno was a leading candidate to become the next associate justice of the United States Supreme Court, Plaintiff, a student and intern, was in no way a person of "public concern."[1]

57.   In no way was Defendant Breaking Media entitled to make a national publication maliciously defaming and attacking Plaintiff, a student and "private person."

58.   Defendant Breaking Media's article constituted an *ad hominem* attack against Plaintiff—a student—by pejoratively referring to him as an "entitled ponce," "unethical," and a "dumb kid," *inter alia.* **[EXHIBIT B]**.

---

[1] "[ . . . ] [A] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. It is speech on matters of **public concern** that is at the heart of the First Amendment's protection. In contrast, speech on matters of purely **private concern** is of less First Amendment concern." <u>Bowman v. Heller</u>, 420 Mass. 517, 525 (1995).

8

59. The plain language of the April 30 article immediately demonstrates, to any reasonable reader, the spurious nature of the deceptive title that the said article was written to "defend" Plaintiff.

60. As proven by the derogatory and abusive language contained in the aforesaid article, Defendant Breaking Media acted with malice and ill will vis-à-vis Plaintiff.

61. As proven by the abusive language contained in the aforesaid article, Defendant Breaking Media knew, or was willful in not knowing, that its defamatory representations would directly cause Plaintiff to lose current and future employment given the accusations of criminal conduct.

62. The subject article published by a "chief editor" of Defendant Breaking Media, Elie Mystal, Esq. (hereinafter, "Mystal"), included numerous material representations which were factually false.

63. Under the doctrine of *respondeat superior*, *inter alia*, Defendant Breaking Media is fully liable for the actions of Mystal, its employee and "chief editor."

64. By way of example only, at p. 2 ¶ 1, Defendant Breaking Media stated, in pertinent part:

> "He [i.e., Plaintiff] was trying to file a petition of mandamus—which basically asks an appellate court to order Judge Moreno to work on his case faster. That's pretty rude."

65. The foregoing material representation is factually false.

66. Quite shockingly, Mystal, an attorney who purports to be a graduate of Harvard Law School, does not appear to be familiar with Rule 55(a) of the Federal Rules of Civil Procedure.

67. For the Court's reference, the said Rule 55(a) expressly provides as follows:

> "(a) **Entering a Default.** When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."

9

68.   In the subject $1,600 civil credit card dispute, as unambiguously stated in the publicly available docket sheet, Plaintiff was attempting to have the **Clerk of Court** make an "entry of default" —*not* Defendant Moreno.

69.   While Plaintiff certainly considered requesting relief from the 11th Circuit Court of Appeals regarding the two (2) separate refusals of the Clerk of Court to make an "entry of default" in violation of Rule 55(a), at no time did Plaintiff request *any* "writ of mandamus" against Defendant Moreno in any court.

70.   At no time relevant hereto did Plaintiff demand that "Judge Moreno work on his case faster[.]"

71.   As a graduate of Harvard Law School, Mystal knew, or was reckless in not knowing, that the foregoing assertion was patently false. *Arguendo*, even if Mystal's rudimentary understanding of the rules of procedure was lacking, a cursory examination of the docket sheet in the aforesaid case would have demonstrated to any reasonable person that the foregoing representation was factually incorrect. **[EXHIBIT C]**.

72.   By way of example only, at p. 2 ¶ 8, Defendant Breaking Media further stated, in pertinent part:

> "Then, to gain entry into [Defendant Moreno's] chambers, [Plaintiff] dropped his USAO cred, even though he was just an intern, and even though he was there for reasons that had nothing to do with his internship."

73.   The foregoing representation—which is stated as an "irrefutable" fact, as opposed to an allegation or opinion—is patently false, and constitutes libel *per se* as it entails an accusation of criminal conduct by Plaintiff.

74.   As explained hereinabove, Plaintiff merely sought to obtain copies of the record. Accordingly, there can be no logical reason why Plaintiff—or any reasonable person, for that matter—would feel the need to commit a criminal offense in order to obtain said copies, which are a matter of public record.

75.   Pursuant to 18 U.S.C. § 912, "[w]hoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any other department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any

10

money, paper, document, or thing of value, shall be find under this title or imprisoned not more than three years, or both."

76.     As an attorney and graduate of Harvard Law School, Mystal had actual or constructive knowledge of the aforesaid criminal statute.

77.     Because Mystal had actual or constructive knowledge of the law, Mystal's acts and omissions were willful or reckless.

78.     By way of example only, at p. 2 ¶ 8, Defendant Breaking Media further stated, in pertinent part:

> "Jon Mullane [i.e., Plaintiff herein] is a little brat who with a USAO internship who had an ex-parte conversation in judge's chambers while trying to file a motion arguing that the judge was lazily ignoring his pro se complaint."

79.     Here, not only does the foregoing demonstrate the ill-will and actual malice of Defendant Breaking Media vis-à-vis Plaintiff, the material representation is factually false.

80.     As explained hereinabove, and as clearly stated in the publicly-available docket sheet, at no time relevant hereto did Plaintiff file any motion whatsoever "arguing that the judge was lazily ignoring his pro se complaint."

81.     As reflected in the publicly available docket sheet, Plaintiff never filed any such motion.

82.     By way of example only, at p. 2 ¶ 1, Defendant Breaking Media further stated, in pertinent part:

> "He didn't know where to file the petition, and ended up asking the judge's career clerk, in the judge's chambers, ex-parte, what to do about it. That's pretty dumb."

83.     In reality, Plaintiff correctly requested **copies of the record** in the correct place.

84.     At no time relevant hereto was Plaintiff filing *any* "petition" whatsoever.

85.     *Arguendo*, had Plaintiff truly wished to file a petition for a writ of mandamus, he would have filed in in the 11th Circuit Court of Appeals—not in any office of a district court.

86.  As an attorney and graduate of Harvard Law School, Mystal knew, or was reckless in not knowing, the requirements of the Federal Rules of Appellate Procedure, together with the simple fact that a petition for a writ of mandamus must be filed in the Circuit Court of Appeals, and not in the district court.

87.  As Mystal and Defendant Breaking Media had access to all hearing transcripts and the docket sheet, Defendant Breaking Media knew, or was reckless in not knowing, that Plaintiff was not looking to file any "writ of mandamus" in the district court.

88.  In addition to the foregoing, Plaintiff correctly went to the Clerk of Court's Office to request copies of the record.

89.  Defendant Breaking Media's complete and utter disregard for the truthfulness and accuracy of the subject publication is rank unconscionable.

90.  Indeed, any reasonable person would find the inappropriate language used in the subject Breaking Media article outrageous and offensive.

91.  The language used clearly demonstrates the actual malice, ill-will, and malevolent intent of Defendant Breaking Media vis-à-vis Plaintiff.

92.  By way of example, this language includes, without limitation, the following words Defendant Breaking Media wrote in the subject article describing Plaintiff:

   (i)    "Dumb"
   (ii)   a "little brat"
   (iii)  "unethical"
   (iv)   an "idiot"
   (v)    "entitled ponce"

93.  By referring to Plaintiff using the above-mentioned pejorative and discriminatory term for an "effeminate man," Defendant Breaking Media unlawfully discriminated against Plaintiff on the basis of sexual orientation, in violation of Massachusetts law.[2]

---

[2] The Supreme Judicial Court has consistently held that harassing speech or conduct does *not* qualify as "protected speech." See, e.g., Commonwealth v. Welch, 444 Mass. 80 (2005).

94.   As a directly foreseeable consequence of Defendants' false accusations of criminal conduct against Plaintiff, many of which were initially made during the aforesaid April 2018 personal telephone call by Defendant Moreno, together with the subsequent publication thereof by Defendant Breaking Media, the SEC foreseeably breached the subject contract on May 3, 2018. [**EXHIBIT D**].

95.   Attorney Lisa Roberts, Esq. (hereinafter, "Attorney Roberts") of the SEC informed the University of Miami School of Law that the singular reason for the SEC's unilateral breach of its employment agreement with Plaintiff was the above-mentioned allegation of criminal conduct.

96.   Defendants knew, or were willful in not knowing, that their interference would foreseeably cause the SEC to unilaterally breach the subject employment agreement with Plaintiff.

97.   Plaintiff incurred *significant* harm from Defendants' unethical and improper conduct as described herein.

98.   *Inter alia,* Plaintiff suffered quantifiable economic damages due to the loss of work experience at both the USAO and SEC, which naturally would have provided Plaintiff with excellent employment prospects.

99.   As a result of Defendants' egregious and unethical conduct, Plaintiff can no longer obtain positive work references from either the USAO or the SEC. As a result, Plaintiff's loss of future earnings over the course of his lifetime is substantial.

100.  Plaintiff cannot secure legal employment in a position for which he is qualified as a direct result of his loss of personal and professional reputation.

101.  As a foreseeable consequence of Defendants' acts and omissions, Plaintiff has been forced to abandon his career goals of practicing law in the federal government, together with his dream of one day practicing in the field of international litigation.

102.  As a foreseeable consequence of Defendants' acts and omissions, the defamatory statements were foreseeably re-published within this Commonwealth and relied on by third parties in Massachusetts. [See, e.g., **EXHIBIT E**].

103.  Given the foreseeable difficulties for Plaintiff to become a member of the Florida Bar, Plaintiff was forced to abandon his application thereto as a direct result of Defendants' intentional interference with the subject contracts.

13

104.  As a result of Defendants' wrongdoing, Plaintiff foreseeably withdrew from the University of Miami School of Law.

105.  In addition to the substantial harm to Plaintiff's legal career, Plaintiff has foreseeably suffered from depression, severe anxiety, and thoughts of suicide.

## COUNT I
### Libel *per se*
### (against Defendant Breaking Media)

106.  Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them as if fully restated herein.

107.  At all times relevant hereto, Plaintiff was, and remains, a "private person."

108.  At all times relevant hereto, Plaintiff acted individually, and not on behalf of the United States or its agencies.

109.  Plaintiff has not actively sought any publicity, public note, or prominence outside of implementing his own business affairs in private transactions.

110.  Plaintiff is not a "public figure" or official within the meaning of New York Times v. Sullivan, 376 U.S. 254 (1964) and its progeny.

111.  Defendant Breaking Media intentionally published to the general public the subject April 30, 2018 article in writing.

112.  The subject article directly pertained to Plaintiff, as expressly stated in its defamatory title.

113.  The subject article was defamatory.

114.  The subject article contained numerous false representations of "fact."

115.  Defendant Breaking Media acted with "actual malice" within the meaning of New York Times, *supra*, because it knew, or was reckless in not knowing, that its material representations in the subject article pertaining to Plaintiff were false.

116.  *Inter alia*, a cursory review of the available public records immediately reveals the falsity of Defendant Breaking Media's misrepresentations.

14

117.    Defendant Breaking Media acted with "actual malice" within the meaning of Mass. Gen. Laws ch. 231 § 92, which is defined as "ill will" or "malevolent intent."[3]

118.    In the subject Breaking Media article, the abusive and derogatory language used to describe Plaintiff, e.g., "entitled ponce," "dumb," "brat," etc., cannot possibly be construed to be anything but malevolent.

119.    Defendant Breaking Media knew, or was reckless in not knowing, of the harm its defamatory representations would cause Plaintiff. This includes, without limitation, the severe harm to Plaintiff's reputation, business opportunities, employment opportunities, social relationships, and Plaintiff's career.

120.    Defendant Breaking Media's written representations constitute libel *per se*. *Inter alia*, Defendant Breaking Media accused Plaintiff of having violated 18 U.S.C. § 912, a criminal offense punishable by three (3) years in federal prison.

121.    Defendant Breaking Media's unlawful acts and omissions were the proximate cause of all of the foreseeable harm incurred by Plaintiff.

## COUNT II
### Slander *per se*
### (against Defendant Moreno)

122.    Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them as if fully restated herein.

123.    In or around April 2018, Defendant Moreno engaged in a personal telephone call with Attorney Greenberg, Plaintiff's employer.

124.    During the subject telephone call, Defendant Moreno stated, as irrefutable "fact," that Plaintiff had violated 18 U.S.C. § 912, a criminal offense punishable by three (3) years in federal prison.

125.    Because the subject slander entails accusation of criminal conduct, the slander is "*per se*" and Plaintiff's damages are presumed as a matter of law.

---

[3] See, e.g., Noonan v. Staples, Inc., 556 F.3d 20 (1st Cir. 2009).

126.    Defendant Moreno's representations were not protected by "absolute privilege," as they were made *ultra vires*.[4]

127.    Defendant Moreno's representation was not protected by "qualified privilege," as Defendant Moreno acted with "actual malice" within the meaning of New York Times v. Sullivan, 376 U.S. 254 (1964) and its progeny.

128.    Defendant Moreno knew, or was reckless in not knowing, that the aforesaid defamatory accusation of criminal conduct was false.

129.    *Inter alia*, Defendant Moreno knew, or was reckless in not knowing, that Plaintiff did not need to "pretend" to be sent by the USAO merely in order to obtain copies of the publicly-available record.

130.    *Inter alia,* Defendant Moreno knew, or was reckless in not knowing, that Plaintiff's motion for an "entry of default" under Rule 55(a) pertained to the **Clerk of Court**, and not to Defendant Moreno himself.

131.    Defendant Moreno acted with "actual malice" within the meaning of Mass. Gen. Laws ch. 231 § 92, which is defined as "ill will" or "malevolent intent." The "ill will" of Defendant Moreno is abundantly clear from the April 10, 2018 hearing transcript. **[EXHIBIT A]**.

132.    The defamatory statements were "published" by Defendant Moreno to Attorney Greenberg, a third party.

133.    Defendant Moreno knew, or was reckless in not knowing, of the harm his defamatory representations would cause Plaintiff. This includes, without limitation, the severe harm to Plaintiff's reputation, business opportunities, employment opportunities, social relationships, and Plaintiff's career.

134.    Defendant Moreno's unlawful acts and omissions were the proximate cause of all of the foreseeable harm incurred by Plaintiff.

## COUNT III
### Tortious Interference with Contractual Relations
### (against Defendants Moreno and Breaking Media)

---

[4] See, Buckley v. Fitzsimmons, 509 U.S. 259 (1993); see also, Archie v. Lanier, 95 F.3d 438 (6th Cir. 1996).

135.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them as if fully restated herein.

136.   Plaintiff had two (2) separate contracts with two (2) separate third parties, to wit, the USAO and the SEC.

137.   Defendants "willfully" and "knowingly," directly or indirectly, caused the USAO and the SEC to breach *both* of the said contracts.

138.   Defendants lacked any privilege to induce the said breaches.

139.   As described hereinabove, Defendants' interference was intentional, and was improper as to both motive and means.

140.   Defendants acted with "actual malice," as Defendants' purposes were spiteful and malignant.

141.   Defendants' intentional interference was the proximate cause of Plaintiff's harm.

142.   All of Plaintiff's damages, as described more fully hereinabove, were the directly foreseeable result of Defendants' intentional interference.

## COUNT IV
### Tortious Interference with Advantageous Business Relations
### (against Defendants Moreno and Breaking Media)

143.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them as if fully restated herein.

144.   Plaintiff had two (2) separate business relationships with two (2) separate third parties, to wit, the USAO and the SEC.

145.   Plaintiff enjoyed an economic benefit from each of the aforesaid business relationships, including, but not limited to: professional recommendations; work experience, which would have increased Plaintiff's job prospects and employability; learning and developing critical legal expertise and abilities; and the important formation of professional and personal relationships with countless attorneys in the employ of the USAO and SEC.

146.   Defendants knew, or were willful in not knowing, of the aforesaid business relationships.

147. As further described hereinabove, Defendants interfered with the two (2) separate business relationships through an improper motive and improper means.

148. Defendants acted with "actual malice," as Defendants' purposes were spiteful and malignant.

149. Defendants' interference was the proximate cause of Plaintiff's harm.

150. Plaintiff foreseeably lost the innumerable advantages of the two (2) business relationships as a direct and natural result of Defendants' conduct.

151. Defendants lacked any privilege to induce the said losses.

## COUNT V
### Tortious Interference with Prospective Economic Advantages
### (against Defendants Moreno and Breaking Media)

152. Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them as if fully restated herein.

153. Plaintiff enjoyed economic relationships between the USAO and the SEC which contained a reasonably probable future economic benefit or advantage to Plaintiff.

154. Defendants knew, or were willful in not knowing, of the existence of the two (2) aforesaid relationships.

155. Defendants knew, or were willful in not knowing, that their actions would interfere with the two (2) relationships and cause Plaintiff to lose, in whole or in part, the highly probable future economic benefits and advantages of the relationships.

156. Defendants acted with "actual malice," as Defendants' purposes were spiteful and malignant.

157. As further described hereinabove, Defendants "willfully" and "knowingly," either directly or indirectly, interfered with the two (2) separate business relationships through an improper motive and improper means.

158. Defendants acted with the sole purpose of harming Plaintiff, and acted by means that are dishonest, unfair, or otherwise improper.

159. Defendants' interference was the proximate cause of Plaintiff's harm.

18

160.    Plaintiff foreseeably lost the innumerable advantages of the two (2) business relationships as a direct and natural result of Defendants' conduct.

161.    Defendants both lacked any privilege to induce the said losses.

## COUNT VI
### Intentional Infliction of Emotional Distress
### (against Defendants Moreno and Breaking Media)

162.    Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them as if fully restated herein.

163.    As further explained hereinabove, Defendants acted intentionally vis-à-vis Plaintiff.

164.    Defendants knew, or were willful in not knowing, that emotional distress was the likely and foreseeable result of his conduct.

165.    Defendants' conduct, as described hereinabove, was extreme, outrageous, beyond the standards of civilized decency, and utterly intolerable in a civilized society.

166.    *Inter alia,* discrimination on the basis of sexual orientation is inherently extreme and outrageous, and is contrary to both the Massachusetts Declaration of Rights and the common law of this Commonwealth.

167.    Defendants are the direct and proximate cause of Plaintiff's distress.

168.    Plaintiff foreseeably suffered—and continues to suffer—emotional distress as a result of Defendants' conduct.

169.    The emotional distress sustained by the Plaintiff was severe and of a nature that no reasonable person could be expected to endure it.

## COUNT VII
### Violation of Mass. Gen. Laws ch. 93A § 2
### (against Defendant Breaking Media)

170.    Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them as if fully restated herein.

19

171.   Defendant Breaking Media is in the "trade" or "business" of operating an online publication within the meaning of Mass. Gen. Laws ch. 93A § 2 *et seq.*

172.   Plaintiff is a "consumer" within the meaning of same.

173.   Defendant Breaking Media was served, via mail and electronic correspondence, a written demand for a "reasonable offer of settlement" pursuant to the said ch. 93A more than thirty (30) days prior to the filing of this action.

174.   Collectively, all of Defendant Breaking Media's acts and omissions, as described herein, constitute unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A § 9, and the Attorney General's regulations published to enforce this law.

175.   *Inter alia,* Defendant Breaking Media's unlawful discrimination based on sexual orientation constitutes an "unfair" and "deceptive" trade practice.

176.   Defendant Breaking Media unfairly refused to make a reasonable offer of settlement to compensate Plaintiff for the harm incurred.

177.   At all times relevant hereto, Defendant Breaking Media's unlawful acts and omissions were both "willful" and "knowing."

178.   Pursuant to Mass. Gen. Laws ch. 93A § 9, Plaintiff is entitled to recover treble damages, together with reasonable attorneys' fees and costs.

## COUNT VIII
### Promissory Estoppel
### (against Defendant Moreno)

179.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them as if fully restated herein.

180.   In his April 9, 2018 recorded voicemail to Plaintiff, Defendant Moreno, acting *ultra vires*, promised Plaintiff that the April 10, 2018 "miscellaneous hearing" pertained to the civil $1,600 credit card dispute.

181.   Through his false and deceptive representations to Plaintiff, Defendant Moreno reasonably should have expected to induce action or forbearance of a definite and substantial character on the part of Plaintiff.

182.   Defendant Moreno's promise did, in fact, induce such action or forbearance.

183.  *Inter alia,* reasonably assuming that the hearing pertained to the <u>civil</u> credit card matter—as expressly promised by Defendant Moreno—Plaintiff appeared at the April 10, 2018 "miscellaneous hearing" without legal counsel present.

184.  Defendant Moreno's promise that the April 10, 2018 hearing pertained to a <u>civil</u> matter was clear, definite, and unambiguous.

185.  Only through enforcement of Defendant Moreno's April 9, 2018 *ultra vires* promise to Plaintiff could injustice have been prevented.

## COUNT IX
### Joint and Several Liability for the Republication of Libel *per se*
### (against Defendants Moreno and Breaking Media)

186.  Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them as if fully restated herein.

187.  In the Commonwealth of Massachusetts, an original publisher of defamatory material is liable for subsequent republication where "the repetition was authorized or intended by the original defamer, or the repetition was reasonably to be expected." Restatement (Second) of Torts § 576.

188.  The Supreme Judicial Court has consistently held that original publishers such as Defendants Moreno and Breaking Media are liable for subsequent republications. <u>See</u>, e.g., <u>Murphy v. Bos. Herald, Inc.</u>, 449 Mass. 42, 65 (2007).

189.  Defendants Moreno and Breaking Media, respectively, are each "original publishers" of *per se* defamation against Plaintiff.

190.  Upon information and belief, on or about October 29, 2018, the defamatory statements were republished within this Commonwealth to Plaintiff and A Medium Corporation, a third party. [**EXHIBIT E**].

191.  Defendants Moreno and Breaking Media knew, or were reckless in not knowing, that their defamatory representations would likely be republished.

192.  Defendants Moreno and Breaking Media knew, or were reckless in not knowing, that the republication of the subject defamation would cause Plaintiff further irreparable harm.

193.    Defendants Moreno and Breaking Media are jointly and severally liable for the subsequent
        republication.

## DEMAND FOR TRIAL BY JURY

        Plaintiff hereby demands a trial by jury on all claims, issues, and questions of fact so triable.

## PRAYER FOR RELIEF

        **WHEREFORE,** on the aforesaid grounds and premises, Plaintiff prays for relief and
respectfully requests that this Honorable Court:

(i)     Enter judgment in favor of Plaintiff and against Defendants on all counts of the complaint;

(ii)    Issue a mandatory injunction and order permanently barring and enjoining Defendants
        from engaging in such unlawful conduct;

(iii)   Award Plaintiff all damages sustained as a result of Defendants' unlawful conduct pursuant
        to all counts herein, including, but not limited to, economic damages vis-à-vis the two (2)
        subject contracts; lost future earnings and economic losses; monetary compensation for
        Plaintiff's loss of reputation, mental anguish, emotional distress, humiliation, depression,
        embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence, and loss of
        personal dignity; and damages for Plaintiff's emotional pain and suffering, together with all
        other physical or mental injuries;

(iv)    Award consequential damages in an amount to be determined at trial;

(v)     Award expectancy damages in an amount to be determined at trial;

(vi)    Award treble damages as permitted under Mass. Gen. Laws ch. 93A § 9, in an amount to
        be determined at trial;

(vii)   Award Plaintiff attorneys' fees, costs, and pre- and post-judgment interest; and

(viii)  Grant such further relief as this Court may deem just and proper.

Respectfully submitted,

JONATHAN MULLANE,
Plaintiff *pro se*
60 Clyde Street
Unit #1
Somerville, MA 02145
Tel.: (617) 800-6925
j.mullane@icloud.com

DATED: November 27, 2018

## **VERIFICATION**

I, JONATHAN MULLANE, under oath, hereby state that I have reviewed the within Verified Complaint, and, based upon my own personal knowledge, hereby verify and affirm that the allegations contained therein are true and accurate, and hereby certify that no material facts have been omitted therefrom.

Signed under the pains and penalties of perjury this 27th Day of November, 2018.

JONATHAN MULLANE

23

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NUMBER 18-20596-CV-MORENO

JONATHAN MULLANE,

      Plaintiff,               Courtroom 13-3

  vs.                        Miami, Florida

BARCLAYS BANK DELAWARE, INC.,      April 10, 2018

      Defendant.

====================================================

MISCELLANEOUS HEARING
BEFORE THE HONORABLE FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

====================================================

APPEARANCES:

FOR THE PLAINTIFF:      JONATHAN MULLANE (PRO SE)
                       1100 S. Miami Avenue
                       #2806
                       Miami, Florida 33130
                                617-800-6925

FOR THE DEFENDANT:      YOLANDA P. STRADER, ESQ.
                       Carlton Fields Jorden Burt, P.A.
                       100 Southeast Second Street
                       Suite 4200
                       Miami, Florida 33131
                             305-539-7332
                         Fax: 305-530-0055

REPORTED BY:           GILDA PASTOR-HERNANDEZ, RPR, FPR
                       Official United States Court Reporter
                       Wilkie D. Ferguson Jr. US Courthouse
                       400 North Miami Avenue - Suite 13-3
                       Miami, Florida  33128   305.523.5118
                       gphofficialreporter@gmail.com

1         **TABLE OF CONTENTS**

2                                                    Page

3

4
Reporter's Certificate ................................... 29
5

6

7

8

9                    **EXHIBITS**

10   Exhibits                 Marked for          Received
                              Identification      in Evidence
11
     Description              Page    Line        Page    Line
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (The following proceedings were held at 9:21 a.m.)

2         THE COURT:  Mullane versus Barclays Bank Delaware,

3    Civil Docket Case Number 18-20596.  The plaintiff.

4         MR. MULLANE:  Plaintiff.

5         THE COURT:  Come over here to the lectern.  Defendant.

6         MS. STRADER:  Yes, Your Honor, good morning.

7         THE COURT:  Grab that other microphone, so you're all

8    even.  There are two microphones.  No, defendant there.

9    Plaintiff at the lectern.  Who's here for the plaintiff?  Who's

10   here for the plaintiff?

11        MR. MULLANE:  I am, Your Honor.

12        THE COURT:  What is your name?

13        MR. MULLANE:  Jonathan Mullane.

14        THE COURT:  Okay.  You're representing yourself.

15        MR. MULLANE:  I am.

16        THE COURT:  You're a law student.

17        MR. MULLANE:  I am.

18        THE COURT:  Okay.  Who's here for the defense.

19        MS. STRADER:  Good morning, Your Honor.  Yolanda

20   Strader with Carlton Fields on behalf of the defendant, Barclays

21   Bank Delaware.

22        THE COURT:  Okay.  Let me tell you why I brought you

23   here.  I know you have a hearing before Magistrate Judge Louis

24   on this case which is a case, obviously since it's an '18 case,

25   that's fairly young.  It was removed on February 15th, less than

 1  two months ago; and then Mr. Mullane, you filed an emergency
 2  motion, you filed an Amended Complaint, you filed a Judicial
 3  Notice.  You're playing lawyer, huh?  You filed a Motion for
 4  Clerks Entry of Default, Motion for Judgment on the Pleadings,
 5  Second Motion for Judicial Notice and then a Motion for Leave to
 6  Appeal, which I don't understand.

 7         MR. MULLANE:  Your Honor, I believe that was the
 8  defendant who filed the request, the two requests for judicial
 9  notice.

10         MS. STRADER:  That's correct, Your Honor.

11         THE COURT:  Don't talk to each other.  Talk to me.

12         You're smiling, and you have no idea what's going to
13  happen to you.  All right?  And that's why I'm here to tell you.
14  Because back on March 23rd you came to my chambers.  It was the
15  Friday before the Ultra concerts, so I let almost everyone go,
16  but my career law clerk, Mariela Martinez-Cid was there,
17  opposing counsel was not there and you came into chambers.

18         Are you an intern at the United States Attorney's
19  Office?

20         MR. MULLANE:  It's my last week, correct.

21         THE COURT:  It is your last week.  It will be your last
22  week and you'll never be able to work at the U.S. Attorney's
23  again, it would be my hope, because I spoke with Mr. Greenberg
24  at the United States Attorney's Office about your outrageous
25  conduct, and I wanted to give you a chance to explain.

1    You walked in through the hallway and you told my
2  career law clerk, Mariela Martinez-Cid, that you worked at the
3  U.S. Attorney's Office, right?

4         MR. MULLANE:  I did.

5         THE COURT:  Which is true but has nothing to do with
6  this case.

7         MR. MULLANE:  Correct.

8         THE COURT:  So you had an ex-parte conversation with my
9  clerk about this case, did you not?

10        MR. MULLANE:  She asked me --

11        THE COURT:  No, no.  She went out and sought you, or
12  you went into my chambers?

13        MR. MULLANE:  I went into your chambers because --

14        THE COURT:  You went into my chambers and identified
15  yourself as working for the United States Attorney's Office,
16  which is routinely done because a lot of people, assistant
17  United States attorneys come in.  They have to drop off things
18  like wiretap applications, all things that can legally be done
19  ex parte, but you have a civil case, which you, yourself, filed.
20  So you're the party, and you came into the judge's chambers
21  without your opponent, right?

22        MR. MULLANE:  Correct.

23        THE COURT:  And you identified yourself as working for
24  the U.S. Attorney's Office --

25        MR. MULLANE:  Not with respect --

1          THE COURT:  -- when this has nothing to do with the
2    United States Attorney, does it?

3          MR. MULLANE:  Correct.

4          THE COURT:  That's outrageous.  That is so wrong that
5    now the United States Attorney has to conduct an investigation
6    on this, because you identified yourself as working for the
7    United States Attorney on a personal case.

8          MR. MULLANE:  No, with respect -- I disagree.  I never
9    said that this was --

10         THE COURT:  Well, you're going to have to deal with
11   your supervisor, and you are going to have to deal with The
12   Florida Bar eventually for this outrageous conduct.  It is
13   absolutely outrageous and you have no idea what you did which
14   shows total lack of judgment.

15         MR. MULLANE:  Your Honor, with all due respect, I made
16   it very clear that this was a personal matter and this had
17   absolutely  nothing to do with --

18         THE COURT:  How dare you go into a judge's chambers
19   without your opponent and try to conduct ex-parte communication?
20   Why would you do that?

21         MR. MULLANE:  I went -- may I explain myself?

22         THE COURT:  You better explain yourself, because I may
23   have a rule to show cause why you shouldn't be held in contempt,
24   and then you're going to need a real lawyer.

25         MR. MULLANE:  I went to the 8th floor, to the Clerk's

1  Office.  I had a question and I was directed towards --

2          THE COURT:  Who directed you?

3          MR. MULLANE:  The gentleman who sits at the --

4          THE COURT:  He said go to the judge's chambers?

5          MR. MULLANE:  Yes.

6          THE COURT:  Ty, go downstairs to the Clerk's Office at

7  the 8th floor, find out who that man is.  You identify him.

8  Take Mr. Mullane.

9          MR. MULLANE:  No problem.

10         THE COURT:  I'll wait for you and bring in that person.

11         MR. MULLANE:  Not a problem.

12         THE COURT:  Would you know his name?

13         MR. MULLANE:  Not at all.

14         THE COURT:  What did he look like, black or white?

15         MR. MULLANE:  White.

16         THE COURT:  How old?

17         MR. MULLANE:  Middle aged.

18         THE COURT:  And what did you tell him?

19         MR. MULLANE:  I said that I had a specific question

20  about the entry of default, and he said you better speak with

21  the clerk or some particular person.  I don't understand the

22  difference between -- like I said, I'm a law student.  I don't

23  understand.  I didn't realize that there are all these separate

24  clerks for the Clerk of Court.

25         THE COURT:  And he said, go talk to the judge in

1  chambers?

2      MR. MULLANE: Yes, Your Honor.

3      THE COURT: He said, go talk to the judge in chambers?

4      MR. MULLANE: No, he didn't --

5      THE COURT: So I'm going to have a hearing. If that

6  deputy clerk comes here and denies that, I'm going to find one

7  of you two committed perjury. So now you tell me whether that

8  clerk of court said to you, go up. I'm a middle-aged deputy

9  clerk and I always tell all the people who come to the Clerk's

10 Office, don't bother me, go talk to the judge, because I don't

11 believe that. I'm going to give you the opportunity to

12 cross-examine him on that.

13     MR. MULLANE: Your Honor, with all due respect --

14     THE COURT: Skip the "all due respect," because you

15 have shown no respect by coming to chambers on a case and now

16 blaming someone in the Clerk's Office.

17     MR. MULLANE: No. Your Honor, he did not say go seek

18 Judge Moreno. He said, go speak to Judge Moreno's clerk which

19 is who I was looking for.

20     THE COURT: And you went into chambers because you

21 don't have a phone. You don't have a phone.

22     MR. MULLANE: He said go upstairs and --

23     THE COURT: He told you go upstairs and go see the

24 judge? You're telling me that?

25     MR. MULLANE: No, I'm not telling you --

1        THE COURT:  Do you want me to place you under oath?

2        MR. MULLANE:  That's not what I said, Your Honor.

3        THE COURT:  Okay.

4        MR. MULLANE:  He said, go speak to Judge Moreno's

5   clerk, not Judge Moreno.

6        THE COURT:  Okay.  And you went and spoke to the clerk.

7   Do you see her over there, Mariela Martinez-Cid?  Okay.  You see

8   her?

9        MR. MULLANE:  Yes, and I also recall her --

10        THE COURT:  And what did you say to her?  She tells me

11   you said you wanted to file a petition for mandamus because I

12   haven't ruled quickly enough on something on a case that's two

13   months old which shows ignorance totally.  So you wanted her to

14   help you on a petition for mandamus which is why you filed a

15   motion in forma pauperis for appeal.  So now you're acting like

16   a prisoner pro se, not a law student.  Do you realize how stupid

17   that sounds?

18        MR. MULLANE:  If I may revisit the topic of the

19   discussion with your clerk as I was --

20        THE COURT:  She's here because I want to make sure she

21   hears what you have to say.

22        MR. MULLANE:  I have nothing to hide.  I have nothing

23   to hide.

24        THE COURT:  Do you realize what trouble you're in?  Do

25   you realize it or not?  I know you've had experience in

1 | Massachusetts, but do you realize what's happening here or not?

2 | Do you think you should seek your own lawyer or not?

3 |         I know you filed a motion in forma pauperis because

4 | you're a pauper.  Are you a law student at the University of

5 | Miami?

6 |         MR. MULLANE:  Yes, I am.

7 |         THE COURT:  You're on full tuition I take it.

8 |         MR. MULLANE:  My parents pay.

9 |         THE COURT:  Okay.  And you don't drive a car.

10 |         MR. MULLANE:  I do not drive a car.  I took the train.

11 |         THE COURT:  How did you get here today?

12 |         MR. MULLANE:  Train, Metrorail.

13 |         THE COURT:  Okay.  Do you pay rent?

14 |         MR. MULLANE:  My parents pay.

15 |         THE COURT:  Your parents pay.  And so you dare file --

16 | Your parents pay, support you.  Where did you go to college?

17 |         MR. MULLANE:  I went to a public institution.  I

18 | studied in Switzerland.

19 |         THE COURT:  Okay.  Well, that doesn't sound like a

20 | pauper to me.

21 |         MR. MULLANE:  I paid a thousand dollars a year for my

22 | tuition.

23 |         THE COURT:  Wonderful.  And so you want me to consider

24 | you in forma pauperis like the prisoners who represent

25 | themselves, who are in jail, who don't have a penny to their

 1   name.  Do you realize how stupid that is, do you, in addition to
 2   probably being dishonest because they don't even have a suit
 3   like you have and they don't have the parents who pay for rent?
 4           Are you understanding what's going on and what you've
 5   done or not, or you're not realizing it?
 6           MR. MULLANE:  With all due respect, I did not lie to
 7   your clerk when she opened the door.
 8           THE COURT:  I didn't say you lied.  I said, you've
 9   committed something wrong by coming into the judge's chambers,
10   identifying yourself as working for the U.S. Attorney's Office
11   and then telling her it's your own private case.  And she asked
12   you to leave, did she not?
13           MR. MULLANE:  And I left.
14           THE COURT:  And you left.
15           MR. MULLANE:  And she referred me back to the --
16           THE COURT:  And did you tell your opponent about your
17   conversation with the judge's chambers about petition for
18   mandamus?
19           MR. MULLANE:  There was no --
20           THE COURT:  Did you converse three weeks ago with your
21   opponent about the fact that you came here to chambers and spoke
22   with the career law clerk of the judge on your case?
23           MR. MULLANE:  With all due respect --
24           THE COURT:  Did you do that --
25           MR. MULLANE:  No.

1           THE COURT:  -- with all due respect?

2           MR. MULLANE:  No.

3           THE COURT:  Which mean you had an ex-parte

4  communication with my clerk and you don't even notify your

5  opponent.  Do you realize how wrong that is?

6           What if your opponent had come in?  What would you say

7  about that?  Do you think that would have been fair?

8           MR. MULLANE:  If she was looking for directions to --

9           THE COURT:  Directions to appeal the judge?  You want

10  her to say, listen, how can I rule for you?  Well, let me have

11  my law clerk help you get a ruling.  Do you realize how

12  ridiculous that is?

13          MR. MULLANE:  That's not what I was seeking.

14          THE COURT:  Did you mention the word petition for

15  mandamus?

16          MR. MULLANE:  I said I --

17          THE COURT:  Did you mention those words?

18          MR. MULLANE:  I did.

19          THE COURT:  Okay.  Do you know what a mandamus is?

20          MR. MULLANE:  Vaguely.

21          THE COURT:  Then you shouldn't even be doing this,

22  because you're getting into trouble.  You don't even understand.

23          Mandamus is to mandate, it's to tell the Court of

24  Appeals that this judge needs to be told to do something,

25  because he's sitting on his butt and not doing anything which

Miscellaneous Hearing

13

1 can be done.  Some prisoners do it if a judge sits on a motion
2 for months or years.

3         This case is not even two months old.  So putting aside
4 the ridiculousness of wanting to petition for mandamus -- which
5 we would expect from a prisoner pro se, okay, but not from
6 someone who wants to be a lawyer, who may never be a lawyer
7 because of what you did in this case.  That's how serious this
8 is.

9         You go to tell the judge's law clerk, help me to see
10 how I can file a petition of mandamus because there's a default
11 that I want you to enter against the opponent who incidentally
12 has filed a Motion to Dismiss which, of course, means a judge
13 can't issue a default when there's a pending Motion to Dismiss,
14 but putting aside the substantive ridiculousness of this, is the
15 fact that you are not recognizing the misconduct that you have
16 committed by coming into chambers and thinking this is no big
17 deal.

18         Do you understand now why I'm having this hearing?  The
19 magistrate is going to have a hearing on whatever was pending.
20 This case has been around for how long?

21         MR. MULLANE:  Since the end of January I believe.

22         THE COURT:  Do you understand how ridiculous it is for
23 you to ask for a quick ruling on something?  Do you understand
24 that there's a pending Motion to Dismiss?

25         MR. MULLANE:  I do understand.

14

1          THE COURT:  Do you understand that in a case in

2   Massachusetts you supposedly accused someone of ex-parte

3   conduct?  Did you do that?

4          MR. MULLANE:  My attorney did, yes.

5          THE COURT:  Your attorney.  What's his name?

6          MR. MULLANE:  It's my father, Peter Mullane.

7          THE COURT:  Look at that, the father who's paying for

8   you to go to law school.  So that means you know what ex parte

9   is though you probably misunderstood in Massachusetts, and here,

10  you're committing it yourself.  All right?

11         So I told the United States Attorney.  He called me on

12  something else.  I was going to wait till after today, and I

13  told him what happened.  He's flabbergasted.  He said, you mean

14  someone went into your chambers and said he works for the United

15  States Attorney's Office as an intern and it was another case?

16  You can't even do that if you get a traffic ticket and say, oh,

17  I'm going to United States Attorney's Office.  That requires an

18  investigation.  Do you realize that?

19         MR. MULLANE:  I understand.

20         THE COURT:  Did you understand before?

21         MR. MULLANE:  I understand that I stated to your clerk

22  that I was there on a personal matter and that I was looking to

23  speak with someone.

24         THE COURT:  And you didn't mention the U.S. Attorney?

25         MR. MULLANE:  Excuse me?

1        THE COURT:  Did you mention the U.S. Attorney?

2        MR. MULLANE:  She had asked me --

3        THE COURT:  Did you mention the U.S. Attorney?

4        MR. MULLANE:  Yes, I did mention the words U.S.

5   Attorney.

6        THE COURT:  You cannot do that.  That's why you're in

7   trouble.

8        Forget about the default, forget about the petition for

9   mandamus, forget about this case, forget about what you're

10   asking for.  I'm not getting into that, because it's a case that

11   is a month and a half old, two months, forget about that.  And

12   by the way, I doubt if there are too many judges in the country

13   who rule faster than I do, but you wouldn't know because you're,

14   what, a first-year law student.  So that doesn't matter to me.

15   It's kind of a joke.  Sometimes I rule too quickly but forget

16   about that.

17        It's the fact that you used the privilege that you have

18   being an intern or extern, whatever the word is, to work at the

19   United States Attorney's Office, that's the biggest no-no that

20   you can do.  Do you realize that or not?

21        MR. MULLANE:  I realize that I answered your clerk's

22   question honestly.

23        THE COURT:  Because she said, who are you.

24        MR. MULLANE:  Yes and I said --

25        THE COURT:  And you should have said, I'm the plaintiff

1  in this case.

2       MR. MULLANE:  I said, I don't understand your question.
3  That's what I originally stated.

4       THE COURT:  And then what happened?

5       MR. MULLANE:  Then she said, but who do you work for?
6  And I said -- I'm still very confused, and she insisted; who are
7  you with, who are you with?  And I said, well, I work for the
8  U.S. Attorney --

9       THE COURT:  That's the mistake.

10       MR. MULLANE:  -- but I'm here on a personal matter.

11       THE COURT:  What does the United States Attorney have
12  to do with this case?

13       MR. MULLANE:  I have no idea.  That's why I kept asking
14  her, I don't understand your question.

15       THE COURT:  Instead of backpedaling like you are now,
16  you should have said, I'm the plaintiff in this case,
17  18-20596-Civil, because that's who you are.

18       MR. MULLANE:  Correct.

19       THE COURT:  That's why you were coming to chambers.

20       MR. MULLANE:  Correct, and I stated that.

21       THE COURT:  And she would have said, I can't let you in
22  because I wouldn't let the other side in, even if she is a
23  Harvard law school graduate with 35 years experience.

24       I don't know if you went to Harvard or not, but you
25  definitely do not have 35 years experience --

1      MS. STRADER:  No, Your Honor, that's correct.

2      THE COURT:  -- based on my observation.

3      It has nothing to do with the U.S. Attorney.

4      MR. MULLANE:  Correct.

5      THE COURT:  You cannot mention the U.S. Attorney when a

6   cop stops you on a red light.  Do you understand that or not, or

7   not?

8      MR. MULLANE:  I now understand.

9      THE COURT:  Well, you should have understood before.

10   How old are you?

11      MR. MULLANE:  I'm 29.

12      THE COURT:  You should understand at 29 years old that

13   you cannot mention the U.S. Attorney in order to get some

14   advantage --

15      MR. MULLANE:  I wasn't trying --

16      THE COURT:  -- even in response to a question.

17      MR. MULLANE:  I was not trying to get any advantage.

18      THE COURT:  You would not have been allowed in.  Do you

19   understand that?

20      MR. MULLANE:  I did not know that, Your Honor.

21      THE COURT:  How can you not know that when your father

22   is a lawyer, filed something accusing someone of ex-parte

23   communication in your case?  How can you not know that, which I

24   understand was a ridiculous accusation in a closed case

25   involving a clerk and a judge?  But putting that aside, how can

1  you claim ignorance like if you were a high school dropout in a

2  prison like many pro se defendants?  You're not that kind of a

3  pro se, right?  Are you?

4           MR. MULLANE:  No, Your Honor.

5           THE COURT:  What do you want to say?

6           MR. MULLANE:  I apologize for the misunderstanding.  I

7  made no attempt to --

8           THE COURT:  It's not a misunderstanding.  It's gross

9  and absolute misconduct and what you're going to have to do now

10  is -- who's your supervisor?  Michelle Alvarez?  You don't even

11  have a supervisor?

12           MR. MULLANE:  Alison Lehr.

13           THE COURT:  Okay.  That's who you've got to see.  It's

14  going all the way up the chain and you're going to have to

15  explain yourself and it's up to them to decide what they should

16  do to you.

17           Do you understand how serious this is?  Do you?  You're

18  shaking your head.

19           MR. MULLANE:  I now understand, yes.

20           THE COURT:  How could you not understand before?

21           MR. MULLANE:  Because the simple --

22           THE COURT:  Do you think everybody walks into a judge's

23  chambers in Federal court?  You know most judges have that

24  outside door locked.  I have it open to make it easier, but this

25  door is locked, and the reason it's locked is because we don't

1 just have people coming in and saying, hey, let me talk to you

2 about my case, so you can talk to the judge.

3          Do you realize how wrong that is, to go into a judge's

4 chambers by yourself and talk about your case?

5          MR. MULLANE:  I wasn't trying to enter your chambers,

6 Your Honor.  I was trying to speak with your --

7          THE COURT:  Oh, what, someone forced you?

8          MR. MULLANE:  Your Honor, I was trying to speak with

9 your clerk to whom I was directed by the person on the 8th

10 floor.

11          THE COURT:  Okay.  Do you want me to bring in that

12 person on the 8th floor, so that the hole gets dug deeper?

13          MR. MULLANE:  No problem.  I've said nothing -- I've

14 said everything as it happened.

15          THE COURT:  Do you want me to bring him up?

16          MR. MULLANE:  No problem.  I've done --

17          THE COURT:  Because it may cost him the job if he told

18 someone, go to the judge's chambers, that's what I tell every

19 pro se litigant.

20          MR. MULLANE:  That's what I was told.  I have no reason

21 to lie.

22          THE COURT:  He told you to go to chambers?

23          MR. MULLANE:  Your Honor, I have no reason to lie.

24          THE COURT:  You do have a reason to lie.

25          MR. MULLANE:  What is that?

1          THE COURT:   The reason to lie -- right now you should
2    be scared.   That's when most people start lying.   You're
3    obviously not scared.   If you're not scared, it means you're not
4    recognizing how wrong you've been.   If you don't recognize how
5    wrong you've been, it shows a total lack of judgment which means
6    you probably cannot be a lawyer, let alone someone working at
7    the U.S. Attorney's Office.   Do you understand that?
8          MR. MULLANE:   I understand.
9          THE COURT:   And you're shifting the blame.   Well, I
10   only said I was working at the U.S. Attorney's Office because
11   your clerk, in order to let me in, said, who are you?   Instead
12   of saying, I'm the plaintiff, because see, if you had said, I'm
13   the plaintiff, what do you think she would have said to you?
14         MR. MULLANE:   I have no idea, Your Honor.
15         THE COURT:   By now, 9:40, you still have no idea --
16         MR. MULLANE:   No, I understand.
17         THE COURT:   -- of what she would have told you?   What
18   do you think she would have told you?
19         MR. MULLANE:   Based on this hearing, I presume she
20   would have directed me to someone else with my question.
21         THE COURT:   She would have said, file whatever you want
22   in writing with notice to the other side, which, by the way,
23   considering this case is two months old and we've got Docket
24   Entry 31, you know how to do that, because you have filed stuff.
25   That way you don't have a communication with a judge without the

1  other side, just like I cannot have a communication with your

2  opponent without you.  How would that make you feel if I had a

3  communication with your opponent without you?  Tell me how that

4  would make you feel.

5           MR. MULLANE:  If it was regarding substantive issues of

6  the case, it would make me very unhappy.

7           THE COURT:  You're right.  It would have been wrong,

8  right?

9           MR. MULLANE:  If it was regarding --

10          THE COURT:  And what else would you be talking to a

11  clerk about?

12          MR. MULLANE:  If it was regarding what time a hearing

13  takes place.

14          THE COURT:  Oh, you mean, the hearings weren't notified

15  in writing?  Things are not done in writing in Federal court?

16          MR. MULLANE:  With all due respect, Your Honor --

17          THE COURT:  Everything is with due respect.

18          MR. MULLANE:  With all due respect, Your Honor, you

19  called my personal phone yesterday, you left a voicemail on my

20  phone.

21          THE COURT:  Do you know why?

22          MR. MULLANE:  Yes, I do know why --

23          THE COURT:  Because as a pro se plaintiff, you do not

24  get the automatic email notices --

25          MR. MULLANE:  I understand.

1      THE COURT:  -- and thus, because you do not get the
2   email notices and I realized, you know what, he doesn't even
3   have notice of this, I did call to let you know and then I had
4   my other clerk in charge of this case email you --

5           MR. MULLANE:  And I appreciate it.

6           THE COURT:  -- in writing.

7           It wasn't to talk to you about the case.  It was to
8   notify you and that's the judge notifying you.  You do not call
9   judges, you do not call law clerks, you do everything in
10  writing.  You don't even go to the 8th floor, because the person
11  in the 8th floor cannot help you.

12          MR. MULLANE:  I see.  I was not aware of that.

13          THE COURT:  How can you not be aware of it?  Okay?  And
14  if you're not aware of it, talk to a lawyer, because you know
15  the old saying?  "He who represents himself" -- can you fill in
16  the rest? -- "has a fool for a client."  Have you ever heard of
17  that?  And that's what you have.

18          Now, normally, the people who want to represent
19  themselves are thrice convicted prisoners who have no money and
20  who have little hope of winning.  Those are usually the people
21  who do that, not people who have a lifetime ahead of themselves,
22  and now you're going to have to fix this mess for yourself,
23  forget about this case.  I don't even know or care what the case
24  is about, because it's one of 202 cases that I have which is the
25  second lowest caseload, I just wanted to tell you.  We all get

1   the same cases, but some of us work harder and faster, okay?

2   But I don't care about this case, and you know what my piece of

3   advice to you is?  You shouldn't care about this case either.

4   What should you care about?

5          MR. MULLANE:  My career.

6          THE COURT:  You got it and your reputation.  All of a

7   sudden, that should be more important than playing lawyer

8   because when you play lawyer, you make mistakes.  If you're pro

9   se, even a fellow who's out, he doesn't care, he's not paying

10  for a lawyer.  He has nothing and we have to bend over backwards

11  for pro se people.  We have to say, well, no, don't you

12  understand and I would have taken a different -- we wouldn't

13  even be having a hearing.

14         I would have let my new magistrate judge who's much

15  more patient than I am, much nicer, and she's new at the job, so

16  she's looking forward to resolving all these issues and she will

17  do that.  Okay?  But you, you've got a career.  You're a what,

18  first-year law student?

19         MR. MULLANE:  Second year, Your Honor.

20         THE COURT:  Second-year law student.  So you're in such

21  a heap of trouble now with the U.S. Attorney, with me, with the

22  law school's internship program.  It's just a big mess that

23  you've made.  Do you understand that?

24         MR. MULLANE:  I understand, Your Honor.

25         THE COURT:  I'm not going to hold you in contempt and

1  I'm not going to do anything on this case until the magistrate

2  and I'm not telling you to dismiss it, though that would be a

3  good idea from a personal standpoint, but for me, it's a nothing

4  case for me. Do you understand that?

5          What's the case about? I don't even know. What's the

6  case about?

7          MR. MULLANE: My credit score.

8          THE COURT: Look at that. Can you imagine? Your

9  credit score. You need your honesty score, your reputation,

10 that is much more important than your credit score. Don't you

11 understand that, and that's what you need to reflect on.

12          Now, I've told Judge Louis that you all were going to

13 be late, so you don't have to worry about it. I scheduled this

14 at 9:00. I wasn't even going to come in today until later;

15 because you had a 9:30 hearing, that's why I scheduled this

16 which is why I called your number and left a message --

17          MR. MULLANE: Thank you.

18          THE COURT: -- myself.

19          Okay? I would never talk about the case with anybody,

20 but see, once you come in and use the word like mandamus, you're

21 talking substance. Do you understand?

22          MR. MULLANE: My question pertained to filing.

23          THE COURT: And what answer can you expect?

24          MR. MULLANE: I was told to go down to the 8th floor

25 and that's what I did.

1          THE COURT:  Later, after you left chambers, you went
2   down to the 8th floor.
3          MR. MULLANE:  Yes.
4          THE COURT:  And what did you do?
5          MR. MULLANE:  And the gentleman will confirm that.
6          THE COURT:  No, I believe you.
7          MR. MULLANE:  And then he called his supervisor.
8          THE COURT:  Imagine all of that calling, to do what?
9          MR. MULLANE:  Very nice African-American woman came and
10  she spoke with me about my question and then the following
11  day --
12         THE COURT:  What did she say?
13         MR. MULLANE:  She said, I'll have to give you a phone
14  call, and I said, okay, thank you.
15         THE COURT:  They can't give you legal advice.
16         MR. MULLANE:  It wasn't -- okay.
17         THE COURT:  What was the question?
18         MR. MULLANE:  I can't remember exactly.  It was about
19  how to file the mandamus request or something.
20         THE COURT:  Look at that.  Mandamus is Latin.
21         MR. MULLANE:  Not to write it.
22         THE COURT:  You know, the people in the Clerk's Office
23  are magnificent.  They're wonderful people.  Latin is not their
24  forte, because we don't teach Latin anymore, which is probably a
25  good thing.  We've got enough problems learning English and

1  perhaps other languages, let alone Latin.  Okay?

2      If you don't know what you're doing, a clerk is not

3  supposed to help you.  That's why you need a lawyer to file a

4  case.  If you don't have the money to hire a lawyer, then maybe

5  you shouldn't be spending so much of your parent's money on law

6  school.  If it's a good enough case to file, you should get a

7  lawyer.  If it's not a good enough case, you shouldn't be

8  practicing law without a license.  Because that's also, though

9  it's your own case, also dumb, isn't it?  Because I don't know

10 what other judges would have done with this.  Some probably

11 would have been harsher in tone than I am, some would have been

12 mellower, to tell you the truth, but I just want you to

13 recognize.

14      MR. MULLANE:  I do and I apologize, Your Honor.

15      THE COURT:  Do you really?  Do you really?  I'm not

16 sure.

17      MR. MULLANE:  Yes.

18      THE COURT:  Because even in response to the email, you

19 even put an exclamation mark.  You were excited to come here to

20 court and I didn't want you to be excited.  I want you to be

21 remorseful and understand what's going on.

22      I don't want to hear anything from defense counsel.  I

23 just couldn't have a conversation with your opponent without

24 you, and I'll let you all decide what you want to do.  So you

25 can walk over now.  I'll call Judge Louis.  You can walk over

 1  now.

 2          Do you know where her chambers are and her courtroom?

 3          MR. MULLANE:  I do not.

 4          THE COURT:  It's in the penthouse of the Atkins

 5  building I think.  It's Judge Atkins' -- Right, is that where it

 6  is?

 7          MS. STRADER:  Your Honor, I'm happy to walk over with

 8  him to make sure.

 9          THE COURT:  Walk over with him.  You can talk about

10  this case if you want.  You can do whatever you want about the

11  case.  I'm not telling you what to do with the case, and now,

12  see, what's going to happen is the U.S. Attorney is going to ask

13  my career law clerk what happened through somebody else and

14  she's going to be -- you know, I don't think there's any dispute

15  of what happened in chambers, but then what you have to do is --

16  you're going to go to the U.S. Attorney's Office today?

17          MR. MULLANE:  Most likely, yes, this afternoon.

18          THE COURT:  Oh, absolutely you should, and you should

19  come in and talk and say, this is what happened to me in front

20  of Judge Moreno today.  I really screwed up.  Let me tell you

21  what happened.  All right.  Because if you don't do that, it's

22  going to be worse, but you do whatever you want.

23          Where did you go to college?

24          MR. MULLANE:  In Europe.

25          THE COURT:  In Europe.  In Europe they do everything in

1  writing.  You don't even go to court most of the time.

2          MR. MULLANE:  I did not study law in Europe, Your
3  Honor.

4          THE COURT:  I know, but I'm just telling you so you
5  learn something from today, and in Federal court, we do almost
6  everything in writing.  In State court, people walk in and out
7  of judges' chambers, and perhaps when people get too loose,
8  that's why some judges even went to jail in my days when I was a
9  State judge.

10          So we're very careful about not having -- and even
11  though they're elected officials, and they know the lawyers on
12  both sides, it's always uncomfortable.  We have to be friendly
13  to both sides, especially a State judge because they run for
14  office but never discuss the case.  Petition for mandamus is
15  talking about the case.  Default is talking about the case, and
16  that's why you can't even cross that line --

17          MR. MULLANE:  I see.

18          THE COURT:  -- even in State court if you graduate from
19  law school.  Do you understand?

20          MR. MULLANE:  (Nodding.)

21          THE COURT:  Do everything in writing and always
22  conferring with your opponent, and then even if you mess up
23  because you're young and inexperienced, at least there won't be
24  any bad faith attributed.  It will just be a dumb thing to do as
25  opposed to a dishonest thing.

```
 1              MR. MULLANE:  Yes, Your Honor.

 2              THE COURT:  Okay.  This is a sermon.

 3              MR. MULLANE:  Yes.

 4              THE COURT:  You can count it for Saturday or Sunday,

 5   whatever you practice.

 6              Okay.  Go ahead see Judge Louis.  Good luck to you.

 7   You'll need it.

 8              MS. STRADER:  Thank you, Your Honor.

 9              MR. MULLANE:  Thank you.

10              THE COURT:  Sorry I made you come.

11         (The hearing was concluded at 9:53 a.m.)

12

13                     C E R T I F I C A T E

14         I hereby certify that the foregoing is an accurate

15   transcription of proceedings in the above-entitled matter.

16

17     04-13-18           _____
          DATE            GILDA PASTOR-HERNANDEZ, RPR, FPR
18                        Official United States Court Reporter
                          Wilkie D. Ferguson Jr. U.S. Courthouse
19                        400 North Miami Avenue, Suite 13-3
                          Miami, Florida  33128    305.523.5118
20                        gphofficialreporter@gmail.com

21

22

23

24

25
```

# EXHIBIT B

# Judge Detonates Pro Se Law Student So Hard I Now Must Defend A Dumb Kid

### The judge kind of overplays his very strong hand.

By ELIE MYSTAL

Apr 30, 2018 at 4:32 PM



You ever see a parent absolutely lose it at their annoying child in a public place? Like, the kid is acting a fool and you wish somebody would go snatch him, and then the parent does, and while the reprimand is totally deserved, it just goes on too long and too intensely that you start to feel sorry for the kid?

That dynamic basically played out in a Miami courtroom. Federal Judge Federico A. Moreno called Jonathan Mullane, a second-year law student representing himself in a credit score dispute, before the bench in a hearing. And Judge Moreno absolutely ripped into the pro se 2L. The transcript is harsh.

Clear as I can tell, Mullane made three critical mistakes to earn Judge Moreno's verbal annihilation.

1 • He was trying to file a petition of mandamus — which basically asks an appellate court to
2 order Judge Moreno to work on his case faster. That's pretty rude.

3 • He didn't know where to file the petition, and ended up asking the judge's career clerk, in the
4 judge's chambers, ex-parte, what to do about it. That's pretty dumb.

5 • Initially, the clerk wasn't even going to let him in, but Mullane said he worked for the U.S.
6 Attorney's Office (he's an intern), which gained him access to the chambers to discuss his own
7 personal case. That's pretty unethical.

8 Judge Moreno ordered Mullane to appear before him and… it went really, really bad for
9 Mullane:

10 THE COURT: Don't talk to each other. Talk to me.

11 You're smiling, and you have no idea what's going to happen to you. All right? And that's why
12 I'm here to tell you. Because back on March 23rd you came to my chambers. It was the Friday
13 before the Ultra concerts, so I let almost everyone go, but my career law clerk, Mariela Martinez-
14 Cid was there, opposing counsel was not there and you came into chambers. Are you an intern at
15 the United States Attorney's Office?

16 MR. MULLANE: It's my last week, correct.

17 THE COURT: It is your last week. It will be your last week and you'll never be able to work at
18 the U.S. Attorney's again, it would be my hope, because I spoke with Mr. Greenberg at the
19 United States Attorney's Office about your outrageous conduct, and I wanted to give you a
20 chance to explain.

21 I imagine Mullane eventually stopped smiling, but he never could really explain himself.

22 Basically Mullane was an idiot who was looking for a clerical functionary to tell him where to
23 file a motion that was going to piss off Judge Moreno anyway. Instead, he ended up in the
24 judge's chambers. Then, to gain entry into those chambers, he dropped his USAO cred, even
25 though he was just an intern, and even though he was there for reasons that had nothing to do
26 with his internship. It's not a good look and Mullane was rightly reprimanded for it.

27 It also appears that Mullane is a little entitled ponce, which further pissed the judge off. Check
28 out this exchange:

29 THE COURT: Do you realize what trouble you're in? Do you realize it or not? I know you've
30 had experience in Massachusetts, but do you realize what's happening here or not? Do you think
31 you should seek your own lawyer or not? I know you filed a motion in forma pauperis because
32 you're a pauper. Are you a law student at the University of Miami?

33 MR. MULLANE: Yes, I am.

34 THE COURT: You're on full tuition I take it.

1 **MR. MULLANE**: My parents pay.

2 **THE COURT**: Okay. And you don't drive a car.

3 **MR. MULLANE**: I do not drive a car. I took the train.

4 **THE COURT**: How did you get here today?

5 **MR. MULLANE**: Train, Metrorail.

6 **THE COURT**: Okay. Do you pay rent?

7 **MR. MULLANE**: My parents pay.

8 **THE COURT**: Your parents pay. And so you dare file — Your parents pay, support you. Where
9 did you go to college?

10 **MR. MULLANE**: I went to a public institution. I studied in Switzerland.

11 **THE COURT**: Okay. Well, that doesn't sound like a pauper to me.

12 **MR. MULLANE**: I paid a thousand dollars a year for my
13 tuition.

14 **THE COURT**: Wonderful. And so you want me to consider you in forma pauperis like the
15 prisoners who represent themselves, who are in jail, who don't have a penny to their name. Do
16 you realize how stupid that is, do you, in addition to probably being dishonest because they
17 don't even have a suit like you have and they don't have the parents who pay for rent? Are you
18 understanding what's going on and what you've done or not, or you're not realizing it?

19 Damn. Turns out the kid's father is also an attorney... wonder if that helped him get his sweet
20 internship.

21 Okay, so Jon Mullane is a little brat who with a USAO internship who had an ex-parte
22 conversation in judge's chambers while trying to file a motion arguing that the judge was lazily
23 ignoring his pro se complaint.

24 But as the hearing went on, and on, and on, Judge Moreno started sounding a little shrill. If
25 Mullane is a dauphin, then Judge Moreno started sounding like the king of his very own anthill.

26 **THE COURT**: Then you shouldn't even be doing this, because you're getting into trouble. You
27 don't even understand. Mandamus is to mandate, it's to tell the Court of Appeals that this judge
28 needs to be told to do something, because he's sitting on his butt and not doing anything which
29 can be done. Some prisoners do it if a judge sits on a motion for months or years.

3

1 This case is not even two months old. So putting aside the ridiculousness of wanting to petition
2 for mandamus — which we would expect from a prisoner pro se, okay, but not from someone
3 who wants to be a lawyer, who may never be a lawyer because of what you did in this case.
4 That's how serious this is. You go to tell the judge's law clerk, help me to see how I can file a
5 petition of mandamus because there's a default that I want you to enter against the opponent
6 who incidentally has filed a Motion to Dismiss which, of course, means a judge can't issue a
7 default when there's a pending Motion to Dismiss, but putting aside the substantive
8 ridiculousness of this, is the fact that you are not recognizing the misconduct that you have
9 committed by coming into chambers and thinking this is no big deal.

10 Do you understand now why I'm having this hearing? The magistrate is going to have a hearing
11 on whatever was pending. This case has been around for how long?

12 Yes, I think we all understand that you are very, very important and this kid has offended the
13 great and powerful Oz.

14 **THE COURT**: Look at that, the father who's paying for you to go to law school. So that means
15 you know what ex parte is though you probably misunderstood in Massachusetts, and here,
16 you're committing it yourself. All right?

17 So I told the United States Attorney. He called me on something else. I was going to wait till
18 after today, and I told him what happened. He's flabbergasted. He said, you mean someone
19 went into your chambers and said he works for the United States Attorney's Office as an intern
20 and it was another case?

21 You can't even do that if you get a traffic ticket and say, oh, I'm going to United States
22 Attorney's Office. That requires an investigation. Do you realize that?

23 Bulls**t. People in the USAO probably pull this exact kind of crap all the time when they get a
24 traffic ticket. I highly doubt that anybody at the USAO is "flabbergasted," they're probably just a
25 little *embarrassed* that one of their interns pulled the power move without any tact. It takes
26 years of experience to figure out how to drop the USAO bomb for maximum effect. And you
27 don't waste it on pro se cases for an issue a secretary could handle.

28 **THE COURT**: You cannot mention the U.S. Attorney when a cop stops you on a red light. Do you
29 understand that or not, or not?

30 **MR. MULLANE**: I now understand.

31 **THE COURT**: Well, you should have understood before. How old are you?

32 **MR. MULLANE**: I'm 29.

33 **THE COURT**: You should understand at 29 years old that you cannot mention the U.S. Attorney
34 in order to get some advantage —

1  **MR. MULLANE**: I wasn't trying —

2  **THE COURT**: — even in response to a question.

3  Your Honor, I think we've covered this.

4  **THE COURT**: Second-year law student. So you're in such a heap of trouble now with the U.S.
5  Attorney, with me, with the law school's internship program. It's just a big mess that you've
6  made. Do you understand that?

7  **MR. MULLANE**: I understand, Your Honor.

8  **THE COURT**: I'm not going to hold you in contempt and I'm not going to do anything on this
9  case until the magistrate and I'm not telling you to dismiss it, though that would be a good idea
10 from a personal standpoint, but for me, it's a nothing case for me. Do you understand that?
11 What's the case about? I don't even know. What's the case about?

12 **MR. MULLANE**: My credit score.

13 **THE COURT**: Look at that. Can you imagine? Your credit score. You need your honesty score,
14 your reputation, that is much more important than your credit score. Don't you understand
15 that, and that's what you need to reflect on.

16 I mean, will my *honesty score* help me get a good rate on my mortgage? No? Well then maybe
17 telling this kid that you don't even give a crap about his credit score is exactly why he stupidly
18 thought a petition of mandamus was something worth doing. The kid wasn't trying to upend
19 the wheels of justice, he made a series of dumb mistakes. Why don't you yell at Miami Law
20 School for not having enough clinical training? Or the USAO for handing out internships like
21 favors? Or do you just want the kid to sit here some more while you yell at the clouds?

22 Goddamn it. See… I don't want to actually defend Mullane. But when you start beating on him
23 like this, eventually my sense of empathy is going to kick in.

24 Everybody here sucks. Let's Fight Club the credit score industry so we never have to speak of
25 this again.

26                                          ——

27 *Elie Mystal is the Executive Editor of Above the Law and the Legal Editor for More Perfect. He can*
28 *be reached @ElieNYC on Twitter, or at elie@abovethelaw.com. He will resist.*

29

# EXHIBIT C

Mullane v. Barclays Bank Delaware, Inc., Docket No. 1:18-cv-20596 (S.D. Fla. Feb 15, 2018), Court Docket

Current on Bloomberg Law as of Oct. 10, 2018 03:00:48

**U.S. District Court**
**Southern District of Florida (Miami)**
**CIVIL DOCKET FOR CASE #: 1:18-cv-20596-RNS**

# Mullane v. Barclays Bank Delaware, Inc.

| | |
|---|---|
| **Date Filed:** | Feb 15, 2018 |
| **Status:** | Closed |
| **Nature of suit:** | 480 Consumer Credit |
| **Assigned to:** | Judge Robert N. Scola, Jr |
| **Case in other court:** | 11th Judicial Circuit of Florida, 18-002827 CA 01 |
| **Cause:** | 28:1441 Notice of Removal |
| **Date terminated:** | Apr 19, 2018 |
| **Jurisdiction:** | Diversity |
| **Jury demand:** | Both |
| **Referred to:** | Magistrate Judge Lauren Fleischer Louis |

## Parties and Attorneys

**Plaintiff**          Jonathan Mullane

**Representation**     Jonathan Mullane
                       60 Clyde Street, Unit #1
                       Somerville, MA 02145
                       (617) 800-6925
                       PRO SE

**Defendant**          Barclays Bank Delaware, Inc.

**Representation**     Robert M. Quinn                          Scott Daniel Feather
                       *Carlton Fields Jorden Burt, P.A.*        *Carlton Fields Jorden Burt, P.A.*
                       4221 W Boy Scout Boulevard               P. O. Box 3239
                       10th Floor-Corporate Center III          Tampa, FL 33607
                       Tampa, FL 33607-5736                     (813) 223-7000
                       (813) 223-7000                           Fax: (813) 229-4133
                       Fax: 229-4133                            sfeather@carltonfields.com
                       rquinn@carltonfields.com                 LEAD ATTORNEY
                       LEAD ATTORNEY                            ATTORNEY TO BE NOTICED
                       ATTORNEY TO BE NOTICED

                       Yolanda P. Strader                       Fentrice D. Driskell
                       *Carlton Fields Jorden Burt, P.A.*        *Carlton Fields Jorden Burt, P.A.*
                       100 S.E. Second Street                   P.O. Box 3239
                       Suite 4200                               Tampa, FL 33601-3239
                       Miami, FL 33131                          (813) 223-7000
                       (305) 539-7332                           Fax: (813) 229-4133
                       Fax: (305) 530-0055                      fdriskell@carltonfields.com
                       ystrader@cfjblaw.com                     ATTORNEY TO BE NOTICED
                       ATTORNEY TO BE NOTICED

## Docket Entries

Numbers shown are court assigned numbers.

| Entry # | Filing Date | Description |
|---|---|---|
| 1 | Feb 15, 2018 | NOTICE OF REMOVAL (STATE COURT COMPLAINT - Verified Complaint and Demand for Trial by Jury) Filing fee $ 400.00 receipt number 113C-10415169, filed by Barclays Bank Delaware, Inc.. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A)(Driskell, Fentrice) (Entered: 02/15/2018) |
| 2 | Feb 15, 2018 | Clerks Notice of Judge Assignment to Judge Federico A. Moreno. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge William C. Turnoff is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. Pro se (NON-PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON-PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (lrz1) (Entered: 02/16/2018) |

Mullane v. Barclays Bank Delaware, Inc., Docket No. 1:18-cv-20596 (S.D. Fla. Feb 15, 2018), Court Docket

| 3 | Feb 26, 2018 | EMERGENCY MOTION for Temporary Restraining Order ( Responses due by 3/12/2018), MOTION for Preliminary Injunction by Jonathan Mullane. (ls) (Entered: 02/26/2018) |
| 4 | Feb 26, 2018 | AMENDED COMPLAINT against Barclays Bank Delaware, inc., filed by Jonathan Mullane.(ls) (Entered: 02/26/2018) |
| 5 | Mar 1, 2018 | NOTICE by Barclays Bank Delaware, Inc. of Appearance (Quinn, Robert) (Entered: 03/01/2018) |
| 6 | Mar 1, 2018 | NOTICE of Attorney Appearance by Robert M. Quinn on behalf of Barclays Bank Delaware, Inc. (ls) (See Image at DE #5) (Entered: 03/02/2018) |
| 7 | Mar 2, 2018 | Clerks Notice to Filer re 5 Notice (Other). Wrong Event Selected; ERROR - The Filer selected the wrong event. The document was re-docketed by the Clerk, see [de#6]. It is not necessary to refile this document. (ls) (Entered: 03/02/2018) |
| 8 | Mar 9, 2018 | MOTION for Judicial Notice by Barclays Bank Delaware, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16)(Quinn, Robert) Modified Text on 3/12/2018 (ls). (Entered: 03/09/2018) |
| 9 | Mar 9, 2018 | MOTION TO DISMISS 4 Amended Complaint FOR FAILURE TO STATE A CLAIM Upon Which Relief Can Be Granted (Fed. R. Civ. P. 12(b)(6)), or Alternatively, Motion to Abate and Supporting Memorandum by Barclays Bank Delaware, Inc.. Responses due by 3/23/2018 (Quinn, Robert) (Entered: 03/09/2018) |
| 10 | Mar 9, 2018 | RESPONSE in Opposition re 3 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Barclays Bank Delaware, Inc.. Replies due by 3/16/2018. (Quinn, Robert) (Entered: 03/09/2018) |
| 11 | Mar 9, 2018 | AFFIDAVIT signed by : Peri Hutt. re 10 Response in Opposition to Motion for Temporary Restraining Order by Barclays Bank Delaware, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J)(Quinn, Robert) (Entered: 03/09/2018) |
| 12 | Mar 13, 2018 | MOTION for Clerks Entry of Default as to Barclays Bank Delaware, Inc. by Jonathan Mullane. (ls) (Entered: 03/14/2018) |
| 13 | Mar 14, 2018 | Clerks Non-Entry of Default as to Barclays Bank Delaware, Inc. - Motions Terminated: 12 Motion for Clerks Entry of Default. Reason: Responsive pleading (i.e. Motion for Extention of Time to File Answer to Complaint, Motion to Dismiss Complaint, etc) has been filed. Signed by DEPUTY CLERK on 3/14/2018. (ls) (Entered: 03/14/2018) |
| 14 | Mar 14, 2018 | RENEWED MOTION for Clerks Entry of Default as to Barclays Bank Delaware, Inc., MOTION for Hearing by Jonathan Mullane. (ls) (Entered: 03/14/2018) |
| 15 | Mar 16, 2018 | MOTION for an Order to Correct Clerk's Failure to Make an Entry of Default pursuant to Rule 55(a) by Jonathan Mullane. Responses due by 3/30/2018 (ls) (Entered: 03/16/2018) |
| 16 | Mar 19, 2018 | ORDER REFERRING CASE to Magistrate Judge Lauren F. Louis for All Pretrial Proceedings. Signed by Judge Federico A. Moreno on 3/16/2018. (da00) (Entered: 03/19/2018) |
| 17 | Mar 19, 2018 | RESPONSE in Opposition and Objection re 8 MOTION for Judicial Notice filed by Jonathan Mullane. Replies due by 3/26/2018. (ls) (Entered: 03/19/2018) |
| 18 | Mar 19, 2018 | MOTION for a Hearing pursuant to Rule 201(e) of the Federal Rules of Evidence by Jonathan Mullane. (ls) (Entered: 03/19/2018) |
| 19 | Mar 19, 2018 | MOTION for Judgment on the Pleadings by Jonathan Mullane. (ls) (Entered: 03/19/2018) |
| 20 | Mar 19, 2018 | RESPONSE in Opposition re 9 MOTION TO DISMISS 4 Amended Complaint FOR FAILURE TO STATE A CLAIM Upon Which Relief Can Be Granted (Fed. R. Civ. P. 12(b)(6)), or Alternatively, Motion to Abate and Supporting Memorandum filed by Jonathan Mullane. Replies due by 3/26/2018. (ls) (Entered: 03/19/2018) |
| 21 | Mar 19, 2018 | REFERRAL to Magistrate Judge Lauren Fleischer Louis. (vjk) (Entered: 03/20/2018) |
| 22 | Mar 26, 2018 | REPLY to 20 Response in Opposition to Motion, by Barclays Bank Delaware, Inc.. (Quinn, Robert) Modified Text on 3/27/2018 (ls). (Entered: 03/26/2018) |
| 23 | Mar 26, 2018 | MOTION Second Motion for Judicial Notice re 22 Response/Reply (Other) by Barclays Bank Delaware, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Quinn, Robert) (Entered: 03/26/2018) |
| 24 | Mar 26, 2018 | NOTICE of Attorney Appearance by Scott Daniel Feather on behalf of Barclays Bank Delaware, Inc.. Attorney Scott Daniel Feather added to party Barclays Bank Delaware, Inc. (pty:dft). (Feather, Scott) (Entered: 03/26/2018) |
| 25 | Mar 26, 2018 | RESPONSE in Opposition re 15 MOTION to Amend/Correct filed by Barclays Bank Delaware, Inc.. Replies due by 4/2/2018. (Feather, Scott) (Entered: 03/26/2018) |
| 26 | Mar 26, 2018 | MOTION for Leave to Appeal in forma pauperis and Writ of Mandamus by Jonathan Mullane. (hh) (Entered: 03/27/2018) |
| 27 | Mar 26, 2018 | AFFIDAVIT re 26 MOTION for Leave to Appeal in forma pauperis by Jonathan Mullane (hh) (Entered: 03/27/2018) |
| 28 | Mar 27, 2018 | REPLY to Response to Motion re 15 Motion to Amend/Correct (Plaintiff's Motion titled Motion for Entry of Default) filed by Jonathan Mullane. (fjn) (Entered: 03/27/2018) |
| 29 | Mar 28, 2018 | PAPERLESS ORDER granting in part 18 Motion for Hearing. Plaintiff's Request for a Hearing is granted. The parties shall report for a hearing on Plaintiff's Request for a Hearing on 4/10/2018 at 09:30 AM before Magistrate Judge Lauren Fleischer Louis. The Court reserves |

| | | judgment on Plaintiff's Opposition and Objection to Defendant's Request for Judicial Notice. Signed by Magistrate Judge Lauren Fleischer Louis on 3/28/2018. (fcn) (Entered: 03/28/2018) |
|---|---|---|
| 30 | Apr 2, 2018 | RESPONSE in Opposition re 19 MOTION for Judgment on the Pleadings filed by Barclays Bank Delaware, Inc.. Replies due by 4/9/2018. (Feather, Scott) (Entered: 04/02/2018) |
| 31 | Apr 5, 2018 | NOTICE of Attorney Appearance by Yolanda P. Strader on behalf of Barclays Bank Delaware, Inc.. Attorney Yolanda P. Strader added to party Barclays Bank Delaware, Inc. (pty:dft). (Strader, Yolanda) (Entered: 04/05/2018) |
| 32 | Apr 6, 2018 | ORDER Setting Hearing. Hearing set for April 10, 2018 at 9:00 AM before Judge Federico A. Moreno. Signed by Judge Federico A. Moreno on 4/6/2018. (da00) (Entered: 04/06/2018) |
| 33 | Apr 9, 2018 | Clerks Non-Entry of Default as to Barclays Bank Delaware, Inc. 14 Motion for Clerks Entry of Default. Reason: Responsive pleading (i.e. Motion for Extension of Time to File Answer to Complaint, Motion to Dismiss Complaint, etc) has been filed Signed by DEPUTY CLERK on 4/9/2018. (fjn) (Entered: 04/09/2018) |
| 34 | Apr 9, 2018 | ORDER ON PLAINTIFF'S MOTIONS FOR DEFAULT; denying 14 Renewed Motion for Clerks Entry of Default; denying 14 Motion for Hearing; denying 15 Motion for an Order to Correct Clerk's Failure to make an Entry of Default pursuant to Rule 55(a). Signed by Magistrate Judge Lauren Fleischer Louis on 4/9/2018. (yar) Modified Text on 4/10/2018 (ls). (Entered: 04/09/2018) |
| 35 | Apr 10, 2018 | ORDER DENYING 3 Motion for Temporary Restraining Order and for Preliminary Injunction. Signed by Magistrate Judge Lauren Fleischer Louis on 4/10/2018. (fcn) (Entered: 04/10/2018) |
| 36 | Apr 10, 2018 | PAPERLESS Minute Order for proceedings held before Magistrate Judge Lauren Fleischer Louis: Motion Hearing held Pursuant to Plaintiff's request ECF No's (17, 18) on 4/10/2018. DE 8 Defendant's Motion For Judicial Notice - Granted and DE 23 Defendant's Second Motion for Judicial Notice- Granted. Total time in court: 15 minutes. Attorney Appearance(s): Yolanda P. Strader, Other appearances: Jonathan Mullane Pro Se Plaintiff. (Digital 10:17:40) (yar) (Entered: 04/10/2018) |
| 37 | Apr 10, 2018 | Minute Entry for proceedings held before Judge Federico A. Moreno: Miscellaneous Hearing held on 4/10/2018. Court Reporter: Gilda Pastor-Hernandez, 305-523-5118 / Gilda_Pastor-Hernandez@flsd.uscourts.gov. (sc) (Entered: 04/11/2018) |
| 38 | Apr 13, 2018 | OBJECTION of Magistrate Judge 34 Order on Motion for Hearing,, Order on Motion to Amend/Correct, to District Court (ls) (Entered: 04/13/2018) |
| 39 | Apr 13, 2018 | Verified MOTION for Recusal for Cause by Jonathan Mullane. (ls) (Entered: 04/13/2018) |
| 40 | Apr 13, 2018 | ORDER granting 39 Motion for Recusal. Signed by Judge Federico A. Moreno on 4/13/2018. (da00) (Entered: 04/13/2018) |
| 41 | Apr 16, 2018 | ORDER GRANTING PLAINTIFF'S VERIFIED MOTION FOR RECUSAL. Judge Federico A. Moreno recused. Case reassigned to Judge Robert N. Scola, Jr for all further proceedings. Signed by Judge Federico A. Moreno on 4/13/2018. (vjk) (Entered: 04/16/2018) |
| 42 | Apr 17, 2018 | ORDER overruling 38 Objection of Magistrate Judge Order to District Court. Signed by Judge Robert N. Scola, Jr. on 4/16/2018. (ls) (Entered: 04/17/2018) |
| 43 | Apr 17, 2018 | ORDER OF INSTRUCTIONS TO PRO SE LITIGANT. Signed by Judge Robert N. Scola, Jr. on 4/17/2018. (ls) (Entered: 04/17/2018) |
| 44 | Apr 17, 2018 | Order Requiring Discovery and Scheduling Conference. Signed by Judge Robert N. Scola, Jr. on 4/17/2018. (ls) (Entered: 04/17/2018) |
| 45 | Apr 17, 2018 | ORDER denying 26 Motion for Leave to Appeal in forma pauperis. Signed by Judge Robert N. Scola, Jr on 4/16/2018. (amb) (Entered: 04/17/2018) |
| 46 | Apr 17, 2018 | NOTICE of Voluntary Dismissal Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) by Jonathan Mullane. (fjn) (Entered: 04/17/2018) |
| 47 | Apr 17, 2018 | TRANSCRIPT of Miscellaneous Hearing held on 04-10-18 before Judge Federico A. Moreno, 1-29 pages, Court Reporter: Gilda Pastor-Hernandez, 305-523-5118 / Gilda_Pastor-Hernandez@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/8/2018. Redacted Transcript Deadline set for 5/18/2018. Release of Transcript Restriction set for 7/16/2018. (gpz) (Entered: 04/17/2018) |
| 48 | Apr 19, 2018 | ORDER of DISMISSAL re 46 Notice of Voluntary Dismissal; Closing Case. Signed by Judge Robert N. Scola, Jr. on 4/19/2018. (ls) NOTICE: If there are sealed documents in this case, they may be unsealed after 1 year or as directed by Court Order, unless they have been designated to be permanently sealed. See Local Rule 5.4 and Administrative Order 2014-69. (Entered: 04/20/2018) |
| | Aug 23, 2018 | SYSTEM ENTRY - Docket Entry 49 [motion] restricted/sealed until further notice. (nc) (Entered: 08/23/2018) |

© 2018 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Mullane v. Barclays Bank Delaware, Inc., Docket No. 1:18-cv-20596 (S.D. Fla. Feb 15, 2018), Court Docket

# General Information

| | |
|---|---|
| **Court** | United States District Court for the Southern District of Florida; United States District Court for the Southern District of Florida |
| **Federal Nature of Suit** | Consumer Credit[480] |
| **Docket Number** | 1:18-cv-20596 |
| **Status** | CLOSED |

# EXHIBIT D



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

OFFICE OF
HUMAN RESOURCES

May 3, 2018

Jonathan Mullane
1100 S. Miami Ave, Apt 2806
Miami, FL 33130

Dear Mr. Mullane:

This letter rescinds the U.S. Securities and Exchange Commission (SEC) initial invitation to
participate in the Student Honors Program in the Miami Regional Office as a Student Honors
Volunteer. The SEC previously sent you an invitation, dated February 28, 2018. It explained
that, prior to confirming this volunteer opportunity, the SEC must perform certain clearances,
including completing a satisfactory pre-appointment check and inquiry into your background,
training, and suitability for the position.

Based upon our review, the SEC has decided to rescind your initial invitation, effective
immediately. I regret that you will not be joining the SEC's team at this time.

Sincerely,

Stephen Brown
Assistant Director
Talent Acquisition Group
Office of Human Resources

# EXHIBIT E

# BOOTH SWEET LLP

32R Essex Street  Cambridge, MA 02139
T: 617.250.8602  |  F: 617.250.8883  |  www.boothsweet.com

October 29, 2018

Jonathan Mullane
60 Clyde Street, Unit #1
Somerville, MA 02145
j.mullane@icloud.com

Sent via email

Re:    A Medium Corporation ("Medium")

Dear Mr. Mullane,

This constitutes Medium's response to your October 25, 2018 email.

The footer of your email states, "*This e-mail message and any attachments are confidential and may be privileged.*" None of that is correct. And it raises a grave concern: Why are you holding yourself out as an attorney? At a hearing this spring in another matter, you described yourself as a second-year law student at University of Miami. ECF No. 47 pp. 10 & 23, *Mullane v. Barclays Bank Delaware, Inc.*, No. 18-cv-20596-RNS (S.D. Fla. docketed Apr. 17, 2018). The University of Miami does not offer an accelerated two-year JD, so you have not graduated, and you do not appear to be admitted to practice law in either Florida or Massachusetts. Remember the Court's advice at the hearing: "If it's a good enough case to file, you should get a lawyer. If it's not a good enough case, you shouldn't be practicing law without a license." *Id.* p. 26. Indeed, you shouldn't be practicing law without a license. And this is not a good enough case to file against Medium.

Section 230 bars civil RICO claims based on user-generated content. See *Kimzey v. Yelp! Inc.*, 836 F.3d 1263 (9th Cir. 2016); *Baldino's Lock & Key Serv. v. Google, Inc.*, 88 F. Supp. 3d 543 (E.D. Va. 2015); *Icon Health & Fitness, Inc. v. ConsumerAffairs.com*, 2017 U.S. Dist. LEXIS 97761 (D. Utah June 23, 2017). The First Circuit has cited *Kimzey* with approval, on the specific issue that making third-party content available online does not change its origin. *See Small Justice LLC v. Xcentric Ventures LLC*, 873 F.3d 313, 321-22 (1st Cir. 2017). There is no reason to think that the First Circuit would construe Section 230 immunity any differently where RICO is alleged.

As your October 5 letter recognized, Medium provides an online publishing platform. That makes it a provider of an interactive computer service within the meaning of Section 230. Your October 25 email seems to contend that Medium's website is not an interactive computer service if Goex did not pay to interact with it. But whether or not a user pays the website operator, Section 230 bars claims against the operator over content generated by the user. Your examples of Yahoo and Facebook, which (like Medium) do not require users to pay before posting, make the point. They are not responsible for third-party posts. Yet you go on to say, "Indeed, if Goex

1

never paid anything for the subject Medium article, it stands to reason that Medium was in fact the true 'speaker' or 'publisher' of that article." You are literally proposing that providing a platform for third-party content makes Medium its publisher or speaker. Read 47 U.S.C. § 230(c)(1) again: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." If you have any valid claims to bring, they would only be against the content provider, Goex.

And based on your correspondence to date, it is far from clear that you have valid claims against Goex either. You have not adequately substantiated your claimed loss. You have not clearly explained or shown the nature, timing, and amount of your investments in Goex, whether in U.S. currency or cryptocurrencies. You have not given any support for your claim that your loss has an approximate fair market value of $32,500. Your October 5 letter came with three exhibits. Exhibit A seems to be from a July 17 screenshot, and the others are of unclear and unattested origin and significance. Exhibit B is undated and unsourced. Exhibit C appears to have been cobbled together from two exhibits in some other unidentified document, and it does not bear any indicia of reliability. Your claims cannot be assessed without reliable evidence. At minimum, please provide all records of or pertaining to your investment in Goex, including your complete email or other communications with Goex, a verified statement from Goex confirming the accuracy of the communications and how they relate to your claimed loss, and an affidavit in which you swear to all relevant facts under penalty of perjury. A partial excerpt from emails between you and an exchange help desk is not sufficient.

Sincerely,

Dan Booth
Booth Sweet LLP
(617) 250-8629
dbooth@boothsweet.com
Massachusetts BBO #672090

2